IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

| | |
|---|---|
| ANNA JOYNER, )<br> )<br> **Plaintiff,** )<br> **v.** )<br> )<br>HHHUNT CORPORATION, )<br> )<br> **Defendants.** )<br> ) | **Civil Action No. 5:19-171** |

## COMPLAINT

1. This is a civil action seeking damages and equitable relief from Defendant HHHunt Corporation's ("HHHunt") unlawful discrimination against Plaintiff Anna Joyner in violation of the Americans with Disabilities Act ("ADA") 42. U.S.C. § 12101 *et seq.*, and wrongful discharge of Plaintiff in violation of North Carolina public policy.

## THE PARTIES

2. Plaintiff Anna Joyner is a resident of Nash County, North Carolina. Plaintiff was employed as the Sales and Marketing Director for Defendant's Spring Arbor Senior Living facility based in Nash County, from 2014 to March 2018. During that period, Plaintiff was an "employee" of Defendant within the meaning of the ADA, 42 U.S.C. § 12111(4), and the common law.

3. Defendant HHHunt is a corporation organized and existing under the laws of the State of Virginia, with its principal place of business in Blacksburg, Virginia. Defendant has a registered office and corporate office in Raleigh, North Carolina. Defendant owns and operates

the Spring Arbor Senior Living facility ("Spring Arbor") located in Rocky Mount, North Carolina.

4. Defendant was at all relevant times an employer within the meaning of the ADA, 42 U.S.C. § 1211(5), and the common law. Defendant at all relevant times employed 15 or more employees.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 42. U.S.C. § 2000e-5(f)(3), 29 U.S.C. § 2617(a)(2), and 28 U.S.C. § 1367(a).

6. Venue is proper in this district under 28 U.S.C. § 1391 because the causes of action arose in Nash County, North Carolina.

## FACTS

7. The foregoing allegations are incorporated by reference herein.

8. Defendant HHHunt is a large land acquisition and development company that owns and operates apartment buildings, planned communities, and senior living facilities in North Carolina, South Carolina, Virginia, and Maryland.

9. Plaintiff began working for Defendant as a Sales and Marketing Director at Defendant's Spring Arbor facility in Rocky Mount, North Carolina. Plaintiff's responsibilities were primarily related to new and prospective client management and marketing. Plaintiff's responsibilities included assisting in the client intake process, handling paperwork for prospective residents, conducting tours of the facility, meeting with the residents' family members, and corresponding with referral sources by phone and e-mail. The large majority of Plaintiff's work was performed onsite at the Spring Arbor facility. Plaintiff sometimes visited local referral sources offsite, often with another co-worker.

10. In early 2017, Plaintiff tripped and injured her right shoulder. She continued to work full-time with her right arm in a sling for several weeks.

11. In August 2017, Plaintiff was diagnosed with an anterior labral tear in her right shoulder. On September 20, 2017, Plaintiff underwent surgery for her shoulder in a hospital in Raleigh, North Carolina. On November 24, 2017, Plaintiff underwent a follow-up procedure for her shoulder.

12. Plaintiff went on Family and Medical Leave Act ("FMLA") leave on September 20, 2017. Defendant did not pay Plaintiff's regular salary while she was on leave, except for a few days for which Plaintiff may have received paid sick leave.

13. In early December 2017, Plaintiff's physician gave Plaintiff permission to return to work as of December 13, 2017. Plaintiff's physician assigned her specific work restrictions. Plaintiff's physician told Plaintiff she could not lift, push, or pull with her right arm. As a result of these limitations, Plaintiff's physician told Plaintiff she could not drive.

14. Plaintiff promptly called her supervisor, Dawana Walston, Defendant's Executive Director for the Spring Arbor facility. Plaintiff explained to Walston that her physician released her to work, informed Walston that she could return to work as of December 13, and discussed her restrictions.

15. On December 6, 2017, Plaintiff sent Defendant a copy of her physician's note releasing Plaintiff to work with the above-described restrictions starting on December 13, 2017. Plaintiff explained that she would need to go to physical therapy appointments three days per week at 4:00 p.m. Plaintiff explained that she would come to work early and stay late to make up any work time missed due to her physical therapy appointments. Plaintiff explained that her husband would drive her to and from work due to her driving restriction.

16.     On December 7, 2017, Walston called Plaintiff and asked Plaintiff if she could perform her job with the physician's restrictions. Plaintiff responded that she could. Plaintiff reminded Defendant that she had worked for several weeks with her right arm in a sling after her initial fall in early 2017. Plaintiff explained that her husband could drive her to and from work. Plaintiff explained that she could get a ride with co-workers if she needed to travel offsite during the work day. Plaintiff expressed her desire to return to work.

17.     Walston told Plaintiff that Plaintiff could not return to work, and instructed her to keep Defendant updated on her physical condition.

18.     Plaintiff could complete her work responsibilities without using her right arm for pushing, pulling, and lifting. Plaintiff had previously performed her job duties with her right arm in a sling for several weeks.

19.     On December 11, 2017, Walston instructed Plaintiff to return her work laptop.

20.     Plaintiff received a letter dated December 13, 2017, stating that as of December 13, 2017, defendant would consider her an inactive employee on an unpaid leave of absence.

21.     After December 13, 2017, Defendant treated Plaintiff as an inactive employee on an unpaid, personal leave of absence until her short-term disability benefits expired. Plaintiff was required to make bi-weekly benefit continuation payments in order to continue receiving her regular benefits.

22.     Before being placed on involuntary leave in December 2017, Plaintiff occasionally traveled to offsite referral sources in the course of her employment. All of these locations were in or near Rocky Mount. Many were clustered together in a single, walkable location, such as Nash General Hospital and associated facilities.

23. Although Plaintiff's physician told her that her limitations would prevent her from driving, she had no restrictions on her ability to travel. There were many reasonable accommodations that, alone or in combination, would have permitted Plaintiff to continue traveling when necessary, including traveling with co-workers who could drive; using taxis, drivers, or ridesharing services; adjusting her schedule to minimize the number of trips needed; and relying on her husband for transportation when his schedule permitted. None of these accommodations would have imposed an undue hardship on Defendant.

24. Plaintiff tried to discuss possible accommodations with Walston. Walston did not discuss the potential accommodations or any alternative accommodations.

25. On December 20, 2017, Defendant posted a job opening for Plaintiff's position. The job description does not state that lifting, pushing, pulling, driving, or traveling were job requirements.

26. Plaintiff repeatedly contacted Walston in January and February 2018 regarding her condition, and her desire and ability to return to work. Walston repeatedly told Plaintiff that she could return to work if her medical restrictions were lifted.

27. Walston stopped returning Plaintiff's phone calls after February 20, 2018.

28. On March 5, 2018, Defendant sent Plaintiff a letter stating that she would be terminated effective March 21, 2018, when her short-term disability benefits expired.

29. On March 21, 2018, Defendant terminated Plaintiff. At the time of her termination, Plaintiff was still under the same medical limitations imposed in December 2017, and was still able to perform the essential functions of her job, with or without reasonable accommodation.

30. Plaintiff was substantially limited in pulling, pushing, and lifting with her right arm as compared to the general population. Pulling, pushing, and lifting are major life activities.

31. In December 2017, Plaintiff requested a number of reasonable accommodations that would have permitted her to continue working. These accommodations would not have created an undue hardship for Defendant.

32. At all times when Plaintiff was permitted to work, she performed her job in a satisfactory manner. Plaintiff was never told that she was performing inadequately.

33. Defendant forced Plaintiff onto involuntary unpaid leave in December 2017, and subsequently terminated Plaintiff, because of her medical condition and limitations.

34. Upon information and belief, Defendant, through its corporate management, deliberately trained, supervised, instructed, and authorized its managers to engage in the above unlawful practices, and approved and ratified their actions in order to enhance corporate profits and reduce labor costs.

35. On May 8, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging the violations of the ADA set forth in Claim I below. On January 30, 2019, the EEOC issued Plaintiff a right-to-sue notice for her charge of discrimination.

**FIRST CLAIM FOR RELIEF**
Violation of ADA, 42 U.S.C. § 12101 *et seq.*
(Wrongful Termination and Failure to Accommodate)

36. The foregoing allegations are incorporated by reference herein.

37. The ADA prohibits discrimination in employment on the basis of a disability. Plaintiff was at all relevant times a qualified individual with a disability under the ADA. 42 U.S.C. §§ 12102, 12111.

38. Defendant regularly employed more than 15 employees at all relevant times.

39. Plaintiff could, with or without reasonable accommodation, perform the essential functions of her position.

40. Plaintiff's medical condition and limitations were neither transitory nor minor.

41. Defendant forced Plaintiff onto involuntary unpaid leave and terminated Plaintiff because of her disability and/or because it regarded her as someone with a disability in violation of the ADA, 42 U.S.C. § 12112(a).

42. Defendant failed to reasonably accommodate Plaintiff's condition in violation of the ADA, 42 U.S.C. § 12112(b)(5)(A).

43. Defendant in bad faith failed to engage in an interactive process with Plaintiff to identify reasonable accommodations in violation of the ADA, 29 C.F.R. § 1630.2(o)(3).

44. Plaintiff has satisfied all procedural and administrative requirements of the ADA by timely filing written charges with the EEOC, receiving a notice of right to sue from the EEOC, and filing this complaint within 90 days from the receipt of the notice of right to sue.

45. As a proximate result of Defendant's unlawful and discriminatory conduct, Plaintiff has suffered lost income, lost benefits, emotional distress, anxiety, humiliation, expenses, and other damages, and is entitled to recover compensatory damages.

46. Defendant's actions were done maliciously, willfully or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

**SECOND CLAIM FOR RELIEF**
Wrongful Discharge in Violation of Public Policy

47. The foregoing allegations are incorporated by reference herein.

48. Defendant regularly employed more than 15 employees at all relevant times.

49. Under the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1 *et seq.*, and N.C. Gen. Stat. § 168A-2, the North Carolina legislature has declared that it is the public policy of the State of North Carolina to protect and safeguard the right and opportunity of all persons to obtain and hold employment without discrimination or abridgement on account of a handicap or disability.

50. Defendant violated the public policy of the State of North Carolina by forcing Plaintiff onto involuntary unpaid leave and terminating Plaintiff on account of her handicap or disability. Defendant wrongfully discharged Plaintiff in contravention of the express public policy of the State of North Carolina, which is actionable under North Carolina law.

51. As a proximate result of Defendant's wrongful discharge, Plaintiff has suffered lost income, lost benefits, emotional distress, anxiety, humiliation, expenses, and other damages, and is entitled to recover compensatory damages.

52. Defendant's actions were done maliciously, willfully or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights. As a result of Defendant's conduct, Plaintiff is entitled to recover punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

(1) That the Court declare that Defendant's practices complained of herein are unlawful under the ADA and North Carolina common law;

(2) That the Court enter a judgment against Defendant and order Defendant to pay Plaintiff compensatory damages, as well as exemplary, liquidated and/or punitive damages;

(3) That the Court award Plaintiff all reasonable costs and attorneys' fees incurred in connection with this action;

(4) That the Court award Plaintiff pre-judgment and post-judgment interest;

(5) That the Court grant the Plaintiff a trial by a jury; and

(6) Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues presented herein.

This the 29th day of April, 2019.

/s/ Paul E. Smith
Paul E. Smith, NC Bar No. 45014
psmith@pathlaw.com
Trisha S. Pande, NC Bar No. 53573
tpande@pathlaw.com
Narendra K. Ghosh, NC Bar No. 37649
nghosh@pathlaw.com
Patterson Harkavy LLP
100 Europa Dr., Suite 420
Chapel Hill, NC 27517
Tel: 919.942.5200
Fax: 866.397.8671

*Counsel for Plaintiff*